FILED

2015 Nov-05  PM 12:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RONALD HARLESS, et al., | ) | |
| | ) | |
| Plaintiffs/Counterclaim Defendants | ) | |
| | ) | |
| vs. | ) | Case No.  2:14-cv-01629-HGD |
| | ) | |
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff | ) | |

## REPORT AND RECOMMENDATION

The above-entitled civil action is before the court on the Motion for Partial Summary Judgment filed by defendant.  (Doc. 11).  Pursuant to the provisions of the Initial Order Governing All Further Proceedings (Doc. 4), plaintiffs' response to the motion was due 21 days after the motion was filed.  To date, plaintiffs have not filed a response to the motion; therefore, the court deems the motion unopposed.

### PROCEDURAL BACKGROUND

Plaintiffs, Ronald Harless and Stephanie Harless, commenced this action by filing a complaint against defendant Cincinnati Insurance Company (CIC) on July 11, 2014, in the Circuit Court of Jefferson County.  Plaintiffs allege that on August 3,

2012, and for some time prior to that date, plaintiffs rented a home at 2301 Parsons Loop Road in Mulga, Alabama.  On August 3, 2012, there was a fire at the home. Plaintiffs made demand of defendant under their renter's insurance policy, which had limits of $150,000.  Plaintiffs allege that defendant has refused to pay them the fair market value of the property loss.  They assert causes of action for breach of contract (Count I), bad faith (Count II), and negligent, reckless and/or wanton denial of insurance benefits (Count III).

CIC removed the action to federal court on August 21, 2014, based on diversity of citizenship and the amount in controversy.  CIC then filed an answer, along with a counterclaim seeking a declaratory judgment as to whether plaintiffs are entitled to any coverage under the policy, whether plaintiffs breached the insurance contract, whether plaintiffs misrepresented or concealed material facts, whether plaintiffs failed to fulfill conditions precedent to coverage, and whether the fire that occurred was due to arson.

After the close of discovery, CIC timely filed its Motion for Partial Summary Judgment.  It seeks summary judgment on plaintiffs' claims of bad faith (Count II) and negligent, reckless and/or wanton denial of insurance benefits (Count III).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Rule 56(c) provides:

(1) **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56©) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). A genuine issue of material fact is shown when the non-moving parties produce evidence so that a reasonable factfinder could return a verdict in their favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). If the non-moving parties fail to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. Rule 56(e), Fed.R.Civ.P., provides that if a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it. . . ." Fed.R.Civ.P. 56(e)(2) and (3). In reviewing whether the non-moving parties have met their burden, the court must stop short of weighing the evidence and making credibility

determinations of the truth of the matter. The evidence of the non-movants is to be believed, and all justifiable inferences are to be drawn in their favor. *Tipton v. Bergrohr GMBH-Siegen*, 965 F .2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted). However, speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005). A "mere scintilla of evidence" in support of the non-moving party also cannot overcome a motion for summary judgment. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## FACTUAL FINDINGS

The record establishes the following undisputed facts. There were two intentionally set fires within a few days of one another at the home the Harlesses were living in as tenants. The home at issue is located at 2301 Parsons Loop Road, Mulga, Alabama. (DX 1, Declaration of Pieter Kes (Kes Decl.), ¶ 13).[1] The first fire occurred on August 1, 2012, in the area around the dryer vent outside the laundry room. (*Id.*). Photographs taken after the fire show the dryer vent and the nearby grass completely unburned, and the dryer vent still had lint in it. (*Id.*). The cause and

---

[1] Pieter Kes is CIC's Capstone Claim Manager and served as a Complex Property Claim Specialist during the time period relevant to the complaint. He handled plaintiffs' claim after the retirement of the original claims representative, Wayne Ashley.

origin investigation conducted after the second fire revealed the presence of an ignitable liquid (weathered gasoline) at the location where the first fire started. (*Id.*).

The second fire occurred just two days later on August 3, 2012. (*Id.*, ¶ 14). The second fire was reported to the insurance agency while the house was still burning. "Patti" from the insurance agency phoned in the loss notice. (*Id.*). The loss was first assigned to CIC employee Wayne Ashley. (*Id.*). Ashley contacted the Harlesses within ten minutes of receiving the loss notice from the insurance agency. He traveled to the scene and met with plaintiffs one hour and five minutes later. (*Id.*).

Three days later, on August 6, 2012, Ashley met with Ronald Harless to tender CIC's first advance payment on the property loss. (*Id.*, ¶ 15). Ashley met with Mr. Harless at an Arby's fast food restaurant and provided Mr. Harless with various forms for use in claiming property loss and also tendered a check for $5,000.00 to Mr. Harless. (*Id.*).

CIC retained Cliff Carlisle with Crain & Associates to conduct a cause and origin investigation to determine whether the fire was accidental. (*Id.*, ¶ 16). Mr. Carlisle inspected the property on August 7, 2012. He took photographs of the property and collected debris samples for laboratory testing. The samples were taken from the two areas where it appeared the two fires originated and sent to the laboratory for chemical testing. (*Id.*). The results indicated the presence of

weathered gasoline at both origin sites. In a report dated August 21, 2012, Mr. Crain determined that the two fires were non-accidental or deliberately set fires. (*Id.*; DX 4, Crain Report). Due to the non-accidental nature of the fires, the claim was assigned to a home office supervisor to support Wayne Ashley's claim handling. The claim was also assigned to CIC's special investigations unit (SIU). Steven Pierce was the special investigator assigned to the loss. (Kes Decl., ¶ 17).

Wayne Ashley next communicated with Ronald Harless by phone on October 11, 2012. (*Id.*, ¶ 18). Ashley confirmed that CIC had received a partial contents list from plaintiffs indicating losses of around $12,000.00. (*Id.*). Ashley agreed to meet the following Monday and provide a second advance check in the amount of $10,000.00. (*Id.*). Ashley met with Ronald Harless on October 15, 2012, and tendered the $10,000.00 advance. (*Id.*). He also requested final lists of property items from the Harlesses as soon as possible. At that meeting, Mr. Harless advised Wayne Ashley that the process would go slowly because his wife has multiple sclerosis. (*Id.*).

On November 1, 2012, Ronald Harless called Wayne Ashley and wanted to know the time frame for additional money. (*Id.*, ¶ 19). Wayne Ashley advised that he needed to get the remainder of the property loss lists. (*Id.*). On November 14, 2012, Wayne Ashley spoke to Mr. Harless by phone. (*Id.*). Plaintiffs were still

working on final property lists and requested an additional advance of $20,000.00. Because the property lists submitted totaled approximately $60,000.00, Wayne Ashley agreed to advance an additional $20,000.00 despite not having final property lists. (*Id.*).

On December 13, 2012, a CIC supervisor, Len Reising, spoke to Mr. Harless. (*Id.*, ¶ 20). Mr. Harless advised Reising that he felt the process was taking too long. Mr. Reising spoke to both Wayne Ashley and Harless and instructed Ashley to use an outside service, Enservio, to review the content list and any receipts provided. (*Id.*). Enservio is an outside vendor CIC used to more quickly and more accurately calculate actual cash value (ACV) for property losses. (*Id.*). CIC's subrogation attorney, Bentley Patrick, noted in the file on December 17, 2012, that the investigation remained open due to the suspicious nature of the fire. (*Id.*, ¶ 21). Wayne Ashley sent the property loss lists to Enservio on December 18, 2012. (*Id.*). CIC received a detailed analysis of the Harless property loss lists from Enservio on January 19, 2013. (*Id.*). Enservio calculated the total amount claimed by plaintiffs as having an actual cash value of $62,741.40. (*Id.*). By that time, CIC already had advanced $35,000.00 to plaintiffs. (*Id.*).

Wayne Ashley met plaintiffs on February 4, 2013, and delivered a check for the remaining $25,741.40 balance of property losses submitted. (*Id.*). At that time,

CIC had advanced and/or paid 100% of the losses claimed by plaintiffs with regard to the fire loss. (*Id.*). The total amount was $62,741.40. (*Id.*). Wayne Ashley noted in the claims file on both April 16, 2013, and June 17, 2013, that he was still waiting for additional contents lists and receipts from plaintiffs. (*Id.*, ¶ 22). Thereafter, Wayne Ashley retired from CIC after many years of service. (*Id.*).

Plaintiffs' claim was reassigned to Pieter Kes for handling after Wayne Ashley's retirement on July 9, 2013. (*Id.*, ¶ 23). Kes reviewed the claim file on the same day it was assigned to him, and he also contacted Ronald Harless that very same day. (*Id.*). Mr. Kes' review of the file revealed two things. First, CIC had paid 100% of the ACV for the contents that had been documented by proof of loss from plaintiffs. (*Id.*). The Harless property losses were reviewed by an outside consultant, Enservio, and the values set by Enservio were paid in full. (*Id.*). Second, Kes' initial review revealed that Wayne Ashley received a large amount of loss forms that mixed together items that were both for personal property replacement and additional living expenses. (*Id.*). These are two separate coverages under the CIC contents policy. Because the documentation submitted by plaintiffs did not separate the property losses from additional living expenses, Wayne Ashley returned the documentation to the insureds and asked them to match up the receipts for the content inventory and

identify receipts that were related to additional living expenses. (*Id.*; DX 7, CIC letter to Harlesses dated March 1, 2013, at 1).

Mr. Kes called Mr. Harless and confirmed that the status of the claim was consistent with his review of the claim file. CIC was waiting for plaintiffs to resubmit receipts in two categories because insurance policies have two separate limits for the two types of coverage. (Kes Decl, ¶ 23). During the July 9, 2013, telephone call with Mr. Harless, Harless informed Kes that there were "many other items" of personal property that were damaged that plaintiffs had yet to claim. (*Id.*, ¶ 24). Kes reminded Harless that the policy contained a 12-month limitation on replacement cost. Kes also reminded Mr. Harless that he could submit claims after the 12-month limit on an ACV basis. (*Id.*). Mr. Harless stated the reason they had been so unresponsive to CIC was because his wife has multiple sclerosis and between his job and taking care of their kids, he had not been able to prepare any further claims. (*Id.*).

On July 29, 2013, Mr. Kes prepared a one-year claim status report. In that report, he noted that CIC had paid 100% of all ACV claims presented by plaintiffs up to that date. (*Id.*). Based on his one-year claim review, Mr. Kes again reminded Mr. Harless of the 12-month limitation for presenting claims for replacement of damaged property. (*Id.*, ¶¶ 24-25). At that time, plaintiffs had not submitted any replacement

cost claims, and Mr. Harless did not indicate they had any intention of submitting any replacement cost claims within the allowable 12-month period. (*Id.*, ¶ 25). Mr. Kes also contacted Special Investigator Steven Pierce and asked him to obtain a copy of the lease between plaintiffs and their landlord because that lease also included information concerning the plaintiffs' purchase of furnishings from their landlord. (*Id.*).

On August 8, 2013, Stephanie Harless contacted CIC to discuss the claim. She explained that she and her husband would be unavailable to meet during the week of August 19, 2013, as requested by Mr. Kes. (*Id.*, ¶ 26). Special Investigator Steven Pierce made a claim file entry on August 8, 2013. (*Id.*, ¶ 27). He had obtained a copy of the Harlesses' lease with Billy Ray Click dated September 1, 2011. (*Id.*). An exhibit to the lease revealed plaintiffs paid a total of $2500.00 for furniture to Click. (*Id.*). Mr. Pierce discussed the claim with Mr. Kes and learned that Mr. Kes planned to meet with plaintiffs to go over the remaining contents portion of the claim and review any receipts and/or supporting documentation. (*Id.*).

On August 8, 2013, Kes contacted Stephanie Harless by telephone and discussed the pending claims plaintiffs had not yet presented. (*Id.*, ¶ 28). Mr. Kes informed her that CIC wished to conduct an examination under oath, and Mrs. Harless would be contacted by Tom Burgess about setting the examination under

oath.  (*Id.*).  Kes reminded Mrs. Harless that he had been requesting ownership documentation from them for two months and had not yet received anything.  (*Id.*). Despite not receiving any further documentation from plaintiffs, Kes informed Mrs. Harless that CIC would pay another $5000.00 advance payment.  (*Id.*).  Kes mailed an advance payment receipt to plaintiffs and asked for them to sign it and return it to him.  In the same letter, Kes reminded plaintiffs that CIC wished to conduct an examination under oath.  (*Id.*).

On August 28, 2013, Attorney Tom Burgess wrote to Mr. and Mrs. Harless to notify them of his retention by CIC and his wish to schedule an examination under oath consistent with Pieter Kes' letter dated August 9, 2013.  (*Id.*, ¶ 29).  In his letter, Mr. Burgess proposed that the examination under oath take place on September 29, 2013, beginning at 9:00 a.m.  Mr. Burgess asked plaintiffs to bring all of their original contents lists, all receipts to substantiate ownership of the items they were claiming, all receipts for items purchased after the fire loss to replace items damaged in the fire, and copies of all affidavits or witness statements in support of their claimed losses. (*Id.*).

Mr. Burgess again wrote to plaintiffs on September 4, 2013.  (*Id.*, ¶ 30; DX 11, Burgess letter).  In that letter, he proposed taking the examination under oath on Thursday, September 26, 2013.  (Kes Decl., ¶ 30).  On September 16, 2013, Mr.

Burgess' paralegal, Karen Vest, emailed Mr. and Mrs. Harless at the email address provided by them. (*Id.*). The email was to confirm their availability for an examination under oath on September 26, 2013. Mrs. Harless responded to Ms. Vest's email and notified CIC that all future communications with them should be through their attorney, Paul Irwin. Mr. Irwin later advised Mr. Burgess that he could attend an examination under oath on September 26, 2013. (*Id.*).

In the meantime, Enservio provided an updated spreadsheet of all of plaintiffs' claimed property losses. (*Id.*, ¶ 31). Enservio broke down the purchases by year. The spreadsheet revealed plaintiffs claimed $18,873.15 of property purchased with cash during 2010, $39,283.23 purchased with cash in 2011, and $62,070.63 purchased with cash between January and August 3, 2012. (*Id.*).

CIC learned additional facts during the examination under oath that cast doubt on the accuracy and/or truthfulness of plaintiffs' property loss claims. (*Id.*, ¶ 32). For example, one item was listed by plaintiffs as having a value of $5600.00. (*Id.*). When questioned about this item, plaintiffs admitted the actual value of the item was only $560.00. (*Id.*). CIC also learned that there were a large number of items listed in the property loss claim that did not belong to plaintiffs. (*Id.*). Specifically, there were 36 separately listed items which were various tools valued at $15,782.17. (*Id.*). In addition to the tools, there were many other items plaintiffs admitted during the

examination under oath they did not own.  This was discussed on pages 92-99 of the examination.  These other items subtotaled $8951.20.  (*Id.*, ¶ 32; DX 6, Examination Under Oath, at 92-99).  The total amount of these items plaintiffs admitted were overstated (or should never have been claimed at all) totaled $29,773.37.  (Kes Decl., ¶ 32).  At the end of the examination under oath, plaintiffs agreed to search for and tender any documentation that they had for any of the items they claimed they owned and lost in the fire.  (*Id.*, ¶ 33).  Plaintiffs also stated they would produce copies of bank statements and other financial documents in order to help substantiate their claim that all of the items claimed lost were purchased with cash.  (*Id.*).

Mr. Burgess emailed Mr. Irwin on October 22, 2013, to follow up with him and ask when he might expect to receive the documentation promised by plaintiffs.  (*Id.*, ¶ 34).  Mr. Burgess again emailed Mr. Irwin on November 5, 2013, to follow up and remind Mr. Irwin that the claim process was completely on hold until CIC received the documentation promised by plaintiffs at the examination under oath.  (*Id.*).  The file remained on hold while CIC waited for plaintiffs to produce the documentation they promised to provide during the examination under oath.  Mr. Burgess again emailed Paul Irwin on January 13, 2014, to follow up on this issue.  (*Id.*, ¶ 35; DX 12, Emails between Tom Burgess and Paul Irwin, at 1).  Mr. Burgess spoke with Mr.

Irwin by phone and was again promised that plaintiffs would bring the requested documents to Mr. Irwin for forwarding to Mr. Burgess.

On February 4, 2014, Mr. Irwin emailed Mr. Burgess and informed him that plaintiffs had collected the information and would bring it to his office.  (Kes Decl., ¶ 35).  On March 5, 2014, Mr. Burgess emailed Mr. Irwin to inform him that a CD dropped off at his office was in fact blank.  (*Id.*).  Mr. Burgess asked for Mr. Irwin to follow up with his clients and get the information to him, as this information was needed to check out some of the sworn information provided by plaintiffs during the examination under oath.  Mr. Irwin responded that he would send another CD with the documentation on it.  (*Id.*).  On April 17, 2014, Mr. Irwin finally delivered approximately 500 pages of documents, most of which were bank statements from 2009 through 2012.  (*Id.*, ¶ 36).  The documents were scanned to a CD and immediately forwarded to Pieter Kes and Steven Pierce for their review.  Mr. Burgess wrote to Mr. Irwin on April 22, 2014, to confirm the documentation was submitted to CIC for review.  (*Id.*).

Between April 22, 2014, and the time plaintiffs filed suit against CIC, CIC reviewed the documentation provided by plaintiffs and found many inconsistencies in those documents when compared with the proof of loss forms submitted by

plaintiffs and when compared with their testimony under oath. (*Id.*).  Plaintiffs filed

this action on July 11, 2014.

D<span style="font-variant:small-caps">ISCUSSION</span>

## Bad Faith (Count II)

In order to prove a claim of bad faith, plaintiffs must show (a) an insurance

contract between the parties and a breach thereof by the defendant; (b) an intentional

refusal to pay the insureds' claim; (c) the insurer's actual knowledge of the absence

of any legitimate or arguable reason; (d) if the intentional failure to determine the

existence of a lawful basis is relied upon, the plaintiff must prove the insurer's

intentional failure to determine whether there is a legitimate or arguable reason to

refuse to pay the claim. *National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183

(Ala. 1982).  Plaintiffs must prove that CIC had actual knowledge that it had no

debatable reason to deny plaintiffs' claims, as well as an intent to injure and

knowledge that it had no lawful basis to refuse to pay the claim.  *Davis v. Cotton*

*States Mut. Ins. Co.*, 604 So. 2d 354, 359 (Ala. 1992); *Chavers v. National Sec. Fire*

*Ins. Co.*, 405 So. 2d 1 (Ala. 1981).  To show that no lawful basis exists requires

evidence that "the insurer lacks a legitimate or arguable reason for failing to pay the

claim." *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981).  If any one

reason for denial of coverage is at least "arguable," a court need not look any further,

and a claim for bad faith refusal to pay will not lie. *Weaver v. Cincinnati Ins. Co.*, 574 So. 2d 771, 774 (Ala. 1990).  "'Bad faith . . . is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'" *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303-04 (Ala. 1999) (quoting *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So.2d 916, 924 (Ala. 1981)).

In this case, there was an insurance contract between the parties.  However, defendant has paid a substantial amount of benefits to plaintiffs, even before receiving any documentation.  Further, despite information that the fires were suspicious in nature, CIC still tendered additional payments.  In fact, CIC has tendered payment for the ACV of items for which plaintiffs claimed and have submitted some documentation, and even hired an outside firm to review the property loss information submitted by plaintiffs.  CIC took these steps notwithstanding the results of the cause and origin investigation and the inconsistencies found in the documentation and in light of plaintiffs' examination under oath.  Further, CIC repeatedly requested additional documentation from plaintiffs to ensure it was paying the ACV (or replacement cost) for all items destroyed or damaged in the fires.  Plaintiffs' failure to provide proof for many months of the value of items they claimed were destroyed or damaged, coupled with their admission during the examination

under oath that they inflated the value of some items claimed and did not own others for which they made a claim, gave CIC an arguable basis for failing to pay any additional insurance proceeds.   Additionally, while CIC was in the process of reviewing the financial information submitted by plaintiffs, plaintiffs filed this action.

The evidence simply does not show CIC's failure to investigate plaintiffs' claims or actual knowledge of the absence of any legitimate or arguable reason for failing to tender any additional insurance proceeds.   Therefore, summary judgment is due to be granted in favor of CIC on plaintiff's bad faith claim.

**Negligence/Wantonness/Recklessness (Count III)**

In Count III, plaintiffs claim that CIC negligently, recklessly and/or wantonly caused or allowed denial of insurance benefits.  (Doc. 1-1, Ex. A, Complaint, at ¶ 14). The Alabama Supreme Court has consistently refused to recognize a cause of action for the negligent or wanton handling of insurance claims.  *See Kervin v. Southern Guar. Ins. Co.*, 667 So. 2d 704, 706 (Ala. 1995);  *Pate v. Rollison Logging Equip., Inc.*, 628 So.2d 337 (Ala. 1993); *Armstrong v. Life Ins. Co. of Virginia*, 454 So.2d 1377, 1380 (Ala. 1984), *overruled on other grounds, Hickox v. Stover*, 551 So.2d 259, 264 (Ala. 1989); *Chavers v. National Sec. Fire & Cas. Co.*, 405 So.2d 1 (Ala. 1981); *Calvert Fire Ins. Co. v. Green*, 278 Ala. 673, 180 So.2d 269 (1965).  *See also Akpan v. Farmers Ins. Exch., Inc.*, 961 So.2d 865, 874 (Ala.Civ.App. 2007) (an

independent adjuster or investigator that was hired by an insurance company to investigate or adjust the claim of an insured owes no duty to the insured).  Therefore, CIC is also entitled to summary judgment in its favor on plaintiffs' claim of negligent, reckless and/or wanton claims handling.

C<span>ONCLUSION</span>

Based on the foregoing, it is n that defendant's Motion for Partial Summary Judgment be **GRANTED** and plaintiffs' claims of bad faith (Count II) and negligent, reckless and/or wanton claims handling (Count III) be **DISMISSED WITH PREJUDICE**.

N<span>OTICE OF</span> R<span>IGHT TO</span> O<span>BJECT</span>

The parties are DIRECTED to file any objections to this Report and Recommendation within a period of fourteen (14) days from the date of entry.  Any objections filed must specifically identify the findings in the magistrate judge's recommendation objected to.  Frivolous, conclusive, or general objections will not be considered by the district court.

Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report shall bar the party from a *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court

except on grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).

DONE this 5th day of November, 2015.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE